(3 App. Div. 480.)

### MAHER et al. v. GARRY et al. (No. 245.)

(Supreme Court, Appellate Division, First Department. April 10, 1896.)

1. CONTRACTS—POWER TO RESCIND—COLLATERAL AGREEMENT.

Defendants' testator associated plaintiffs with him in business under a written contract, providing that plaintiffs should invest a specified sum, and should manage the business, drawing weekly salaries; that, from the profits, testator should withdraw the amount of his capital from time to time, with interest. The agreement expressly provided that, until this amount was entirely paid, testator or his executors should have the power to alter any portion of the agreement, or to cancel the same absolutely, on repaying to plaintiffs the sums invested by them. By a parol agreement, made before the main contract was signed, testator agreed to add a codicil to his will, providing that, as long as plaintiffs fulfilled their part of the contract, his executors should not cancel it. Such codicil was actually annexed to the will, but afterwards revoked. *Held,* that the parol agreement was a part of the general contract, and, under the power given to testator to alter or cancel any part thereof, he had the right to rescind the parol agreement to limit by codicil the power of his executors. Patterson, J., dissenting.

2. SPECIFIC PERFORMANCE—INDEFINITE AGREEMENT.

A parol agreement providing merely that, if plaintiffs conform to the contract, the business should be continued until the amount due testator was paid, the contract containing nothing to indicate what was meant by conforming to the contract, and not limiting the time within which the amount due testator should be paid, is too indefinite to be enforced in equity.

Appeal from special term, New York county.

For former report, see 37 N. Y. Supp. 605.

In May, 1892, and for years prior thereto, the defendants' testator, Thomas Garry, was engaged in the retail dry-goods business in Grand street, in this city. The plaintiffs were clerks in his employ; Maher receiving $33 per week, and Molohan receiving $18 per week. The testator had an investment of upward of $151,000 in the business. He wanted to withdraw this capital, and gradually retire from active participation in the business; but he was not willing to relinquish any part of his sole ownership until he had withdrawn this amount and interest. To effectuate this object, he requested the plaintiffs to enter into a certain contract, the essential points of which, so far as they

relate to the matters involved, are that the business should continue until such time as Thomas Garry could withdraw from it his capital, with interest; that the plaintiffs should each contribute $4,000 to the business; that, during the period while withdrawals were being made by Garry, the plaintiffs should be allowed to withdraw the same amount each week that they had formerly been receiving as salary, and that during such time they should have no further interest in the business or profits; that, upon the withdrawal of his capital and interest, it should become the duty of Garry to execute to each of the plaintiffs good and sufficient transfer of a one-fifth interest in and to the business, and all the capital, assets, and effects, good will, etc., connected therewith, except the lease. Further provisions of the contract are as follows: "Eleventh. It is further mutually and expressly agreed by the parties hereto that the party of the first part, his executors, administrators, successors, or assigns, shall at any time subsequent to the date of this agreement, and before the withdrawal of said full sum of $151,327.45 and interest, have full power to in all respects terminate, rescind, and annul said agreement, as to either or both of said parties of the second part, if he or they shall see fit so to do, free from any claim for damages or otherwise on the part of the said parties of the second part, or either of them; provided, however, that the said party of the first part, or his executors, administrators, successors, or assigns, shall, in case of such rescission, repay to the parties of the second part such sums of money as they may have theretofore contributed to the capital of the said business, as provided in section second hereof, together with interest on such sum from the time of contribution thereof. If said contract shall not be so rescinded until the full withdrawal of said sum of $151,327.45, it shall thereafter be binding on said party of the first part, except as herein provided. It is also understood and agreed that the party of the first part may at any time assign, transfer, or set over his entire interest in the said business, and the assets, effects, and profits thereof, or any portion of such interest, to any person or persons whatsoever, and that any such transferee shall be admitted as a partner in the said firm, if desired by the party of the first part; it being the understanding and intention of the parties hereto that during the whole time of the continuance of the said business, as set forth in section first hereof, the said party of the first part shall remain the sole owner of the said business, and the assets and effects thereof, with the same full power of disposition or transfer thereof, in case he sees fit so to do, as though this agreement had not been made. During said time the party of the first part may also, at will, alter the provisions of the foregoing sections." By the fifteenth clause it was provided that, after the capital had been withdrawn, the testator, or his representatives, successors, or assigns, should have the deciding voice as to any matter that might arise in the conduct of the business, and might at any time change any of the provisions in relation to such conduct. The sixteenth clause provides that, after the testator has been repaid his capital and interest, he or his representatives "shall have the power, at any time during the continuation of the said business, to transfer his interest therein, or in the profits thereof," to such parties as he or they may see fit. The seventeenth clause provides that, if the testator or his representatives choose to form a special partnership after his capital is withdrawn, he may designate the general partners, "and he and his representatives shall have full power in all respects to fix the particular terms and conditions of such special partnership which shall bind said parties of the second part." The twenty-third clause is as follows: "Twenty-Third. It is further expressly provided that the death of the party of the first part during any of the periods herein specified shall not affect his rights, or those of his executors, administrators, successors, or assigns, but that each and every provision herein contained shall apply to such executors, administrators, successors, and assigns with the same force and effect as they would have had as regards said party of the first part had such death not occurred; and, if such death shall occur after the withdrawal of said sum of $151,327.45 and interest, it shall not cause any alteration in the general partnership, if organized, or dissolve said special partnership, if formed; but such representatives and assigns, or any persons appointed by them, shall in all respects occupy the position of the said party of the first part, and said business shall continue as herein provided."

What took place when this paper was offered for signature is thus detailed by one of plaintiffs' witnesses: "At the time of reading, Mr. Molohan objected to signing it under its present conditions. He said, 'Mr. Garry,' who was present, and myself, that as far as Mr. Garry was concerned, that he would trust him, and sign it, but he said, 'You are liable to die. [He was looking sickly at the time.] What would your executors do? What position would it place us in if we would sign this?' Mr. Garry replied, stating that he would make a codicil to his will directing his executors to conform to the agreement; that is, if they conformed to the agreement, to continue the business until the amount was paid, and that the contract would be fulfilled." And thereupon the agreement was signed. Upon cross-examination, this witness stated that his recollection was that "there was objection made at the time of reading certain paragraphs. I could not, without looking at the agreement, remember the numbers of the paragraphs to which objection was made." "There was a protest against signing under such provisions. Mr. Molohan made it, before the reading was completed. That is my recollection. Mr. Molohan made a protest. As I have stated before, he said to Mr. Garry: 'As far as you are concerned, I would trust you under the circumstances. But you are a sickly man. You may die; and, in case the executors should desire to close this business, what would our position be?' Mr. Garry then stated to them that he would add a codicil to his will, directing his executors to have that business continued provided these young men, Maher and Molohan, would comply with the contract." It was .stipulated that the lawyer who drew the agreement would give similar testimony to that above detailed, with the addition that he would testify "that Mr. Molohan's statements at the interview with regard to his confidence in Mr. Garry were that he was willing to trust Mr. Garry as to continuance of the business during the latter's lifetime, but that he objected to trusting Mr. Garry's executors under the agreement as drawn." Thereupon the plaintiffs said that with that understanding they would sign it, which they did; and thereafter they entered upon the conduct of the business, and complied with all their duties under the contract, including the payment of $4,000 as each, as required by its terms, which, in the event of the contract being canceled, was to be returned, and which, with interest, has been tendered by the defendants. During the intervening period between the date of the contract and the commencement of this suit, Thomas Garry, before his death, and, since that time, his executors, have withdrawn $114,844.76 out of the $151,000 and upward which constituted his capital, and which latter .sum, under the agreement, he was entitled to draw before the plaintiffs acquired any rights in such business. After the execution of the agreement, Garry executed a codicil to his will, in which he incorporated a provision somewhat similar to that which he had promised to provide. He subsequently executed another will, which contained no such provision, by which these defendants were appointed as executors; and, as such, claiming the right to do so, they have notified the plaintiffs, since the death of Garry, of their desire to cancel and annul the agreement. .

Argued before VAN BRUNT, P. J., and WILLIAMS, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

Frederic R. Kellogg, for appellants.

Samuel Untermyer, for respondents.

O'BRIEN, J.   The object of this suit is to obtain a judgment enjoining and restraining the defendants, as executors of Thomas Garry, from attempting to rescind, annul, terminate, or modify the contract between the plaintiffs and the said Garry, and from liquidating, selling, disposing of, or interfering with, the business, or with its assets and effects, or with the control and management thereof by the plaintiffs, and from excluding them from the premises occupied by the business, or from its books and property, upon the grounds that, by the terms of the agreement, the decedent became bound, not

only to execute a written contract, which was actually signed, but also to make a will of such a nature that the executors should have no power, as against these plaintiffs, under the circumstances now existing, to wind up the business, and to do the things which they are now attempting to do; and that, either through innocent mistake or through fraud, the will which the decedent promised to execute was not, as a matter of fact, made by him.

The two questions which naturally present themselves at the outset are as to whether the understanding or agreement relied upon as to Garry's making a will could be proved by parol evidence, and, if it could, whether such shows a binding agreement. In reading the contract between the plaintiffs and Garry, it will be noticed that it contains covenants executed by both parties, and embodies provisions which assume to provide not only for the contingency of death, but for nearly every other conceivable contingency as well. Notwithstanding that thus the contract appears on its face to be complete, plaintiffs claim the right to establish, by parol, an agreement contemporaneous with the execution of the written instrument, which the respondents insist is inconsistent with the latter, but which the appellants claim is a collateral agreement, and therefore, as coming within the class of exceptions, is not a violation of the rule which excludes the admission of parol evidence to vary, contradict, or control a written contract.

In Thomas v. Scutt, 127 N. Y. 133, 27 N. E. 961, which is the latest expression of the court of appeals on the subject, it is said:

"It is a general rule that evidence of what was said between the parties to a valid instrument in writing, either prior to or at the time of its execution, cannot be received to contradict or vary its terms. This rule is not universal in its application, because the courts, in their efforts to prevent fraud and injustice, have laid down certain exceptions, which, although correct in principle, are sometimes so loosely applied in practice as to threaten the integrity of the rule itself. The real exceptions may be grouped into two classes, the first of which includes those cases in which parol evidence has been received to show that that which purports to be a written contract is, in fact, no contract at all. * * * The second class embraces those cases which recognize a written instrument as existing and valid, but regard it as incomplete, either obviously or at least possibly, and admit parol evidence not to contradict or vary, but to complete, the entire agreement, of which the writing was only a part. * * * Two things, however, are essential to bring a case within this class: First, the writing must not appear upon inspection to be a complete contract, embracing all the particulars necessary to make a perfect agreement, and designed to express the whole arrangement between the parties, for in such a case it is conclusively presumed to embrace the entire contract; second, the parol evidence must be consistent with, and not contradictory of, the written instrument."

Are the two things essential to bring a case within the exception allowed to the general rule present in the case at bar? Is there anything to indicate upon inspection of the written agreement that it was not designed to express the entire understanding of the parties? And is the agreement thus supported by parol "consistent with, and not contradictory of, the written instrument"? We think it would be difficult to conclude, after reading the written contract, consisting of 27 clauses, which apparently was designed to cover every possible contingency that could arise, that such an agreement

was not on its face complete, and did not contain the entire agree-
ment of the parties. But assuming that we are justified in regard-
ing the written contract as incomplete, and the parol agreement as
collateral and supplemental, can it be said that it is consistent with
the written agreement? The latter expressly deals with the rights,
powers, and obligations of the testator's executors with respect to
the contractual relations then created by it; and the parol agree-
ment must be regarded as relating to the same subject-matter, be-
cause its effect is to destroy the very provisions of the written agree-
ment which refer to the rights, powers, and obligations of the execu-
tors. It will thus be seen that both cover the same area. In each
the subject was the powers of the executors of the testator to deal
with the business with reference to which the contract was made,
after his death. The written agreement gave to the executors the
identical power to terminate the interest of the plaintiffs which was
reserved by the testator to himself during his life. By the parol ar-
rangement, as interpreted by the plaintiffs, the executors were to be
precluded from exercising the right to terminate the contract so long
as the plaintiffs conformed to its requirements. An agreement to
make testamentary provisions prohibiting the defendants from inter-
fering with the business is the equivalent of an agreement on the
part of the testator that his executors should not exercise such right.
Not only this, but the provisions evidence an intention upon Garry's
part that neither he nor his estate would be in any way legally
obliged to perform any one act; and in this respect the plaintiffs
were willing to take their chances. If, then, we give the force to
the parol agreement claimed for it by the plaintiffs, is it not clearly
inconsistent with, and does it not annul, the express provisions of the
written contract?

Without, however, deciding that the parol agreement is inconsist-
ent with, and would tend to vary and contradict, the written instru-
ment, and assuming that equity would enforce a distinct and defi-
nite agreement, and give relief regardless of the operations of rules
of law or statute, when the result of recognizing such rules would
be, not the prevention, but the commission, of a fraud, we are brought
to the second consideration, as to whether the parol agreement was
such a binding and definite contract that, if in writing, it would be
enforced. If we assume, then, that Garry agreed to make a codicil
directing his executors "that, if the plaintiffs conformed to the agree-
ment, they were to continue the business until the amount was paid,
and the contract fulfilled," it will be noticed that there is an ab-
sence, not only of anything to indicate what is meant by "conform-
ing" to the agreement, but there is no time fixed when the amount
to which the testator was entitled is to be paid. While living, he
had "full power to determine at what time and in what manner" his
capital should be drawn; and so, under the written agreement, the
executors have the same power. But the parol agreement is silent
as to the time and manner in which the money was to be paid; and
thus the executors, if the plaintiffs are right, are under obligation
to permit the business to continue for an indefinite and uncertain

period of time. There is abundant authority for the proposition that equity will not undertake to enforce specifically a contract which is indefinite and uncertain in its character. Stanton v. Miller, 58 N. Y. 192; Shakespeare v. Markham, 72 N. Y. 400; Crosdale v. Lanigan, 129 N. Y. 604, 29 N. E. 824. The plaintiffs, seeing the force of this, have offered to stipulate against any injury flowing to the estate from the absence of any definite provision on this subject. But this does not aid us in determining the question as to the plaintiffs' right to relief, which must be predicated upon the agreement itself, though if, upon that, we could reach a conclusion favorable to the plaintiffs, it might be that equity would require that the relief should be accorded upon certain conditions which the court would undoubtedly have the right to impose. Our conclusion upon this branch of the case is that the parol contract is too indefinite to be enforced. But, if definite, is it binding?

The written contract imposed no obligation on Garry or his estate prior to the withdrawal of his capital. It is conceded that Garry had the right, at any time during his life, before his capital was withdrawn, arbitrarily to cancel the agreement, and to return to each of the plaintiffs his $4,000. He was the sole owner of the business until such withdrawal of capital. He could sell the business, and the purchaser could cancel the agreement. In fact, the written agreement permitted him to do as he chose with the property, so long as any part of his capital remained in the business. And, even after it had been withdrawn, he was to fix the terms of any partnership, and the interests of the partners. If into such an agreement we read the parol understanding relied upon by the plaintiffs, can it be said that there was any binding obligation created? It is not claimed that, if so written in, the clauses relating to the right of Garry in his lifetime to annul and cancel the agreement at any time before his capital was withdrawn would be in any way destroyed or impaired. Therefore, in respect to the agreement to make the codicil to his will, restricting the right of his executors, this was subject, as was every other provision of the agreement, to the arbitrary will and disposition of Garry. If, during his lifetime, he had canceled the agreement, or had sold the business to another, then all the rights which the plaintiffs had under the agreement, including the provision for a codicil, would have fallen. If we are right in our reasoning, then it follows that he was at liberty at any time during life arbitrarily to change his mind in regard to making a codicil to his will, or making any provision for the security of the plaintiffs after his death; and this power was not dependent upon his canceling the entire agreement, because, while any portion of his capital remained, he could annul any of its provisions. And that this was his understanding clearly appears, because he executed a codicil some time after, which, to a certain extent, complied with what plaintiffs claimed was the parol agreement, and later made a new will which had no such clause as it is now insisted he should have included therein; and thus the evidence is afforded that he changed his mind on this subject. He was not required by the agreement to

indicate in any way his change of mind, and he was therefore at liberty to notify them or not of such change.

It will thus be seen that we agree with the views of the learned trial justice that:

"The plaintiffs concededly gave to the testator the absolute power to cancel during his lifetime. The trust which they reposed in his willingness to deal justly with them was fully as great as that which they would be expected to place in him if they placed a moral reliance upon his executing a favorable provision in his will. They were willing to trust him, at the same time, not to exercise unjustly the power to cancel and also to incorporate a provision in his will continuing the business. Both acts had to be performed in his lifetime. Both acts were left, not only to his sense of justice, but to his possible perception of the danger of continuing a business decreasing in value, or increasing in risk, in times of financial distress; so that he might provide for himself or for his estate when he could no longer supervise it against the perils of the future. So considered, the whole transaction at the time of the signing of the instrument was consistent with the purposes and intentions of the parties; and it is the most reasonable supposition that the plaintiffs relied upon his willingness to allow the business to continue after his death, if, in his judgment, it should likely be safe to do so, rather than, upon a legal obligation, to prevent after his death the doing of a thing which he might do in his life, and which legal obligation was nowhere incorporated into the lengthy and expressive instrument which contained the agreement of the parties."

Apart, therefore, from the question as to whether the oral agreement varied and was inconsistent with the written contract, and upon the grounds that such agreement is too indefinite to be enforced, and is not binding, we think the judgment should be affirmed, with costs.

VAN BRUNT, P. J., and WILLIAMS, J., concur.

INGRAHAM, J. (concurring). The extremely unfortunate position in which plaintiffs now find themselves, and the manifest injustice of the position taken by the defendants in exercising the power given to them by the contract to terminate, rescind, and annul it at any time before the withdrawal of the full sum of $151,327.45, naturally incline us to find, if possible, some method by which we can prevent such injustice being done to the plaintiffs. We are, however, confronted with the contract that the plaintiffs have themselves executed. They have seen fit to agree that the defendants' testator, his executors, administrators, successors, or assigns, shall have this right to terminate, rescind, and annul the agreement at any time before the full amount agreed to have been paid to the defendants' testator from the business shall have been actually paid to them; and it is that agreement that we are required to enforce. We cannot make a new agreement for the parties, nor can we deliberately overlook or disregard the express terms of the contract that the parties have made.

This provision of the eleventh clause of the contract is explicit, and gives to the testator and his executors the full and uncontrolled power, in their discretion, to terminate the agreement at any time prior to the final withdrawal of the sum specified. The evidence shows that that provision and its effect were clearly understood by the plaintiffs before they signed the instrument. Thus, with their

eyes open, understanding what they were doing, they made the agreement. Having made it, the testimony is that, at the same time, another and independent agreement was made between the plaintiffs and the defendants' testator, and we are asked to enforce that agreement. I think it clear that the latter was not one that was in conflict with this written agreement that the parties then executed, but one that was entirely independent of it, and not at all inconsistent with it. The testimony is that the plaintiffs objected to executing the proposed written agreement, on the ground that, while they would trust Mr. Garry, the contingency of his death was presented to them; and then the question came up as to what the executors would do in case of Mr. Garry's death, the contract giving to the executors the same power that Mr. Garry had to terminate the contract. To meet that objection, it was not proposed to take away from the executors this power to rescind the contract. It was not proposed to restrict them as to what they could or could not do as between the plaintiffs and the executors in case of Garry's death. Mr. Garry said to the plaintiffs that he would make a codicil to his will, directing his executors to have the business continued, provided the plaintiffs would comply with the contract; and with that agreement the plaintiffs were content, and signed the contract. This understanding with Mr. Garry as to the codicil that he would execute would not be at all inconsistent with the discretion that the executors had to terminate the contract. Garry made no agreement with the plaintiffs that his executors would not exercise the power. He simply said that, by a codicil, he would direct his executors not to exercise it upon certain conditions; and, as between the plaintiffs and the executors, it left them in the position by which the executors had the power to rescind the contract, that power being expressly given to them by the contract that was signed after Garry had agreed that he would make a codicil by which he would leave direction to his executors as to how they should exercise the power given them by the contract. The only effect that the execution of such a codicil would have as between the plaintiffs and the executors would be that, under it, the executors would have the power to continue the business if, in their discretion, they considered it for the benefit of the estate. It might be that one of the executors or one of the legatees or beneficiaries under Garry's will would have the right to ask the court to compel the executors to carry out Garry's directions; but these plaintiffs would not be in a position, under the contract they had signed, to ask the court for a judgment restraining the executors from enforcing this express provision by which power was given to them to rescind the contract.

A different question would have been presented had the plaintiffs, before the executors had formally rescinded the contract, tendered to the executors the amount that was unpaid of the sum that Garry or his estate was entitled to withdraw from the business, and then insisted upon the contract for the continuation of the partnership being performed. That, however, was not done. The amount had not at the time of the trial been withdrawn from the business, and,

under the express provisions of the contract in force as between these plaintiffs and the executors, the executors had the power to terminate the contract, and the existence of such a codicil would not justify the court in taking away from the executors the power expressly given to them by the agreement.

I can see no escape from the conclusion that this judgment was right, unless we are prepared to make an entirely new contract for the parties, instead of enforcing the one that they have made. I concur, therefore, in an affirmance of the judgment.

PATTERSON, J. (dissenting). I am not able to agree with the views expressed in the opinion of the court in this cause, nor in the conclusion at which Mr. Justice INGRAHAM has arrived in his concurring opinion. It is conceded that the equities are overwhelmingly with the plaintiffs, but it is considered that the court is powerless to grant relief, by reason of supposed insurmountable obstacles in fixed rules of law applying to the contract relations existing between the parties. In my judgment, not only do those alleged obstacles not exist, but, the intrinsic merits of the plaintiffs' cause being so clear and indisputable, an efficient remedy may be afforded within and pursuant to well-established elementary principles of equity, without violating or ignoring any rule of law or of evidence, and without the arbitrary exercise of judicial authority. We have before us a plain case of a grievous, contemplated, and threatened wrong, imposing upon the court a plain duty, one which it should be eager to discharge, and not astute to evade, namely, to grant that measure of relief which the plaintiffs' rights demand, and to withhold which, it seems to me, is purely and simply a denial of justice.

Many, but not all, the material facts, are mentioned in the prevailing opinion; but no reference is made to the exact situation of the parties, nor to the leonine charactea of the contract made by the defendants' testator with the plaintiffs. Mr. Garry, desiring to retire from any active connection with the business owned by him, proposed to put it absolutely in the charge of his two clerks, the plaintiffs, for them to conduct without any participation by him; they to devote their whole time and to mortgage their future for his benefit; he to retain absolute ownership of the business; they to withdraw from it only such weekly sums as were equal to the wages theretofore paid them; they to advance every dollar of necessary cash capital,—that is to say, each to advance $4,000 (and the evidence shows that the indebtedness of the business never, during any period of its currency, was greater than between $5,000 and $8,000); he (Garry) to receive, from the profits of the business made for him by the labor and the capital of these plaintiffs, the sum of $151,000, with interest at 6 per cent.; and, when that sum was paid him, the plaintiffs were to acquire, as their reward, each a one-fifth interest in the business, Garry still retaining three-fifths of the whole. Those are facts in the case which should be made prominent. Garry was to secure to himself every dollar he had in the business, real or imaginary, was to be the absolute owner, was to take no part in conduct-

ing it, to do no work, but to leave everything to the fidelity, the diligence, and the business skill of his two clerks; and all that they had to look forward to, after Garry was satisfied in full, was the acquisition of a small fractional proprietorship in the business, which would give them a standing, and open to them, possibly, a business career.     They were willing to enter into this contract in the hope and expectation referred to, and they were also willing to stipulate that Mr. Garry might, at any time before the full sum of $151,000 and interest at 6 per cent. was paid to him, from profits to be earned by them, terminate the agreement, and resume possession of the business, by returning to them their capital.     This they were willing to do, obviously, because they not only trusted to the integrity, the sense of justice, and the gratitude of Garry, but because it is patent that it could not be to his interest to put an end to a contract so immensely beneficial to himself, so long as they faithfully carried out their part of it by paying to him, from profits, the whole value of his business, and leaving him, when that was done, the lion's share of what remained.

When the preliminaries of this contract had been settled, and the parties met to execute a written agreement, at the office of the attorney who prepared it, the plaintiffs found that there had been inserted therein a provision (that referred to in the opinion of the court), namely, that not only should the contract be determinable at the pleasure of Mr. Garry, but also at the mere instance of his executors, administrators, or assigns, upon a return of the capital contributed by the plaintiffs.     It is stated in the opinion of the court that this provision was objected to by the plaintiffs.     It was not only objected to, but, according to the testimony of Mr. Banning, one of the executors of Mr. Garry, it was protested against, by the plaintiffs.     I do not read the testimony as the majority of the court have done.     Mr. Banning distinctly swears there was a protest against signing with such provision.     "Mr. Molohan [he says] made it before the reading was completed.     That is my recollection.     Mr. Molohan made a protest.     Molohan said to Garry: 'You are liable to die. What would your executors do?     What position would it place us in if we would sign this?'"     Manifestly, they would not be guilty of the folly of committing themselves to this contract, and expending years, perhaps, of faithful labor, with the use of their money, only to find themselves thrown back upon the world at the volition or caprice of strangers, and just at a time, perhaps, when their contract would be upon the eve of fulfillment.     There is no doubt that Mr. Garry recognized the reasonableness and the justice of this protest, and thereupon stated that he would make a codicil to his will directing his executors to conform to the agreement; that is, if they (the plaintiffs) conformed to the agreement, to continue the business until the amount was paid, and that the contract would be fulfilled.     Thereupon the plaintiffs, as Mr. Banning says, stated that, "with that understanding, they would sign it"; and they did sign it, and thus they executed and delivered the contract, upon the distinct understanding and agreement that Garry would do as he promised.     Their

act in so signing and delivering was a consideration for the promise Garry made. There is nothing ambiguous or vague in this part of the transaction. It was a distinct stipulation between the parties that in one certain event or contingency, and only in that one event or contingency, should any limitation be put upon the right to rescind the contract. And this brings us to the consideration of the question as to the legal effect of this particular feature of the transaction.

It would appear that the learned judge at special term admitted all the testimony respecting the protest of the plaintiffs, and the statement and promise made by Mr. Garry to overcome it. That testimony was all objected to, and, if the objections were valid and the testimony were inadmissible, it would be folly to base any judgment upon it. But, in my opinion, that testimony was entirely competent. It was not introduced for the purpose of varying or modifying a written contract between the parties, which was to contain or might have contained all the terms and conditions of all that was in negotiation prior to the execution of the written paper. It was merely a collateral agreement, respecting, it is true, a matter in one sense germane to the whole transaction, but actually something that was distinct and separate, and intended to be kept separate, from that which was to be comprehended in the main agreement. The case does not fall within the ruling in Eighmie v. Taylor, 98 N. Y. 288, and Thomas v. Scutt, 127 N. Y. 133, 27 N. E. 961, and cognate cases, for the evidence does not affect a paper designed to signify and to execute the terms of the whole contract agreed upon between the parties, and which was adequate for the purpose of embracing all that was agreed upon. This proof was not intended to import into a written contract a term which should have been inserted therein, and the case differs toto cælo from those relied upon to exclude the testimony.

There are three elements, each one of radical difference: First. By specific agreement between the parties, the stipulation was not to be inserted in the main agreement, but was to be absolutely independent and collateral. Second. In the very nature of things, it could not have been inserted in the agreement, because it was something that was to be done by Mr. Garry by last will and testament or codicil thereto. It was to be done by an instrument to be executed by Mr. Garry alone, and which no one but himself could execute; and it was not contemplated in any way that any reference should be made, in the written agreement then signed, to such a codicil. Third. It appears without dispute that Mr. Garry, in conformity with this collateral agreement, did actually execute a testamentary paper of the character he promised to execute as a condition of the plaintiffs' signing and delivering the contract to him. So that the evidence of the collateral contract was complete. Its terms were definite, and what was intended by Mr. Garry as performance thereof was actually made. I think, therefore, it is clear from the circumstances which surrounded the execution of the agreement, and all the attending facts, and the positive testimony of Mr. Banning, that the matter with reference to the direction to be given to the ex-

ecutors in case Mr. Garry should die before full performance of the contract by the plaintiffs was a thing it was neither contemplated nor intended should go into the main agreement, but should be kept as a matter extrinsic and entirely independent of the terms of that agreement.

If the foregoing views on this subject are correct, then it will not be disputed that it was incompetent for Mr. Garry to revoke or destroy the codicil. While the provisions of that codicil are not as broad nor as beneficial to the plaintiffs as their agreement justified them in expecting, yet, doubtless, it evinced Mr. Garry's apprehension of what had been agreed to, and would be the measure of the plaintiffs' rights. The parol evidence is that Garry stated that his will would contain a direction to his executors to conform to the agreement so long as the plaintiffs conformed to it. This is referred to in the opinion of the majority of the court, and it is suggested that there is no meaning of any definite character to be ascribed to these words. But Mr. Garry ascribed a meaning to them, and that is to be found at folio 169 of the case; and it is that, if the plaintiffs conform to the agreement, the business was to be continued until the amount was paid (referring to the $151,000), and that the contract would be fulfilled. There is no misunderstanding possible of this testimony. It comes from an executor of Mr. Garry's will, a man who was present at the time the papers were executed and the collateral agreement was made; and Garry perfectly understood that, in the event of his death, so long as the plaintiffs performed their part of the contract, the business was to be continued.

Of course, equity will not undertake to enforce a contract indefinite and uncertain in its character; but what could be more definite and certain than this testimony of the executor of Mr. Garry's own will, who was a witness to all that took place between the plaintiffs and Mr. Garry? Mr. Garry's own understanding of the matter appears from the codicil to his will dated May 24, 1892; and here it is important to observe that this codicil was executed just 10 days after the main agreement was signed and delivered, and must have been for the purpose of carrying out the collateral contract, and of making that independent instrument which he promised to make as a condition of the plaintiffs' signing the agreement of May 14, 1892. This codicil states that the testator wishes and desires the business established, etc., to be continued "while the same can be conducted successfully and with profit to my estate; and I desire that my said executors shall permit my friends John Francis Maher and Patrick Molohan, or any partner or partners I may have at my decease, to have the management and control of my said business as long as, in the discretion of my said executors, they manage the same profitably." Now, this, of course, is not as broad as the agreement testified to by Mr. Banning; and yet, at the same time, it shows that Mr. Garry's understanding of the plaintiffs' conforming to the agreement as testified to by Mr. Banning was so long as the same was managed profitably. This codicil clearly expresses the purpose and desire of the testator that the business shall be continued so long as

it could be profitably done; and the discretion which is given to the executors is not the discretion to terminate at any time or under any circumstances, but the business is to be continued so long as it is successful, and produces profit for the estate,—that is to say, profit directly from the business.    It is not a general discretion, as Mr. Justice INGRAHAM, in his opinion, construes it to be. These executors do not set up in their answer that the business has been managed unprofitably.    They do not allege any want of fidelity on the part of the plaintiffs, or any dissatisfaction with their conduct of the business, which they, assuredly, could not have done in view of the enormous returns of clear profit made to Mr. Garry in his lifetime, and to them since his death.    They have therefore no reason or ground to complaint of the management, nor to exercise a discretion adversely to the continuance of the business.

It seems to me, therefore, that the case should stand precisely as if the promised codicil were now in operation; and that the plaintiffs have the right to invoke it as a shield against the termination of the agreement by the executors; and that they have a right to come into a court of equity, and say that they have performed their contract honestly and faithfully, and to the great profit and advantage of Mr. Garry and of his estate, and to seek the protection of the court from the cruel wrong which these executors are seeking to inflict upon them, under the color of technical rights, which Mr. Garry expressly contracted against, and which justice and equity demand should not be enforced.

I think that the judgment should be reversed, and, on the whole case, a judgment should be directed for the plaintiffs, granting an injunction restraining the defendants from interfering or molesting them in the conduct of the business so long as the same is conducted profitably.

Frederic R. Kellogg, for appellants.
Samuel Untermyer, for respondents.

WILLIAMS, J.   We have heard the appeal from the judgment in this case at the present term (38 N. Y. Supp. 436), and have felt constrained to affirm such judgment.   We have thus become familiar